Good morning, Your Honor. Stephen Cox for Living Designs, et al., the appellants and plaintiffs in this case. We are here on a ruling and judgment by the district court below that was in essence a ruling on three summary judgment motions, two motions on the pleading, actually four summary judgment motions that deal with a fraudulent inducement to settle case, as we've pointed out in our briefs. The appellants are here today for a variety of reasons. First of all, it has been determined over and over and over again in these cases that Dupont, the defendant, and Appelli in this case committed fraud, that the fraud was material. It was material misrepresentations of fact that were very, very important to anyone who was going to litigate one of these product liability cases. Judge Elliott, the district court judge in the Middle District of Georgia who presided over the Bush Ranch case, found that the concealment of what I have termed in our brief the Alta II documents, which are the Bush Ranch Alta documents, the Lambert reanalysis documents, those documents were referred to as the Alta II documents, both specifically by Judge Ibarra, who was the circuit court judge in Hawaii who presided over the Kalamata case, who also found that the concealment of these documents by Dupont was fraudulent by clear and convincing evidence. The Hawaii Supreme Court referred to it as an egregious case of discovery fraud by Dupont. And so the timing of the settlements of this case in April of 1994 puts them in the identical position that Judge Elliott found himself in in May of 1995 when he had the fraud hearings in Georgia. It puts Malone, the plaintiff's lawyer in that case and my clients now who were being represented by him in the identical position as Judge Ibarra was, the circuit court judge in Hawaii, when he found that the assertion of the work product privilege to keep these documents, the Alta II documents, from seeing the light of day, that he was defrauded, that it was extremely relevant, it was extremely material. In fact, it was so material that he ruled in his 60B order following the verdict in that case that had he known that they were falsely asserting the work product privilege, that he would have granted a default in that case. Also because of the content of the Alta II documents, and this is important because I know that Dupont is making a pitch here, and it ended up in the order that they wrote for the district court below, that he essentially rubber-stamped a 64-page order that just mentioned their evidence, didn't even mention our evidence, didn't even specifically refer to many things that we submitted to the court in opposition to the summary judgment motions. And if you're ruling on a motion for summary judgment and you're going to give all the inferences that are reasonable to be given to the nonmoving party, you have to look at the plaintiff's evidence, specifically as respect to the Alta II evidence, the Bush Ranch documentation, the Lambert reanalysis. We submitted through a crime fraud proceeding that we were able to obtain a letter from John Lacy, who was the defense lawyer in the Kalamata case. That was the Hawaii case where this evidence was uncovered in September of 1994, six months after we settled. And John Lacy, and that letter is before the court, there were two letters. There was a draft letter and then a letter that was actually sent to Jerry Ashby, who was the inside Dupont counsel in Wilmington, said to him that when this Alta II evidence came in, it was evidence of cover-up and fraud that would support a punitive damage award in the six or a crooked number with six, a big number, I think is what he said, with six or seven zeroes after it. What does evidence of cover-up have to do with your case? You have to establish settlement fraud. What the settlement value of your case would have been. It seems to me that's very different from a situation where in the midst of trial you have proof of a evidentiary cover-up. No, Your Honor. I think the — when you get the Alta documents, you get not just evidence of contamination. You get evidence of cover-up. Well, see, but your theory is that suppose there hadn't been a fraud. Well, you've undone the cover-up, too. No, that's not — my theory is this. What would a fair settlement have been had all that evidence been known? That's what this Court and — Well, okay, that's fine. Yes. If all that evidence had been known, you wouldn't have had a cover-up and you wouldn't have extra value because of the cover-up unopened or opened up during the course of trial. No, because the time you find out about it, all of that happened in June of 1993. I don't know that you're allowed to pick the point where you want the fraud to end. If we said there was no fraud in the first place, then you wouldn't have had a cover-up and you wouldn't have cover-up value. You'd have the actual value of your case. But John Lacey's letter doesn't refer to the actual value of the case. It refers to the cover-up punitive damage problem. The actual value of one of these products liability cases with that evidence is what happened in the Kalamata case, a $25 million verdict with $14 million in damages. Oh, because that's exactly what he's talking about. That's the cover-up value. You get a big punitive damage award because it's demonstrated that DuPont's committed fraud. But if you remove the fraud, which I understand to be the measure of your claim, assume there wasn't a fraud, you don't have that cover-up value. You have the real value of your case, which may be enhanced, but I don't think you've got the cover-up value. Your Honor, I respectfully disagree with your analysis because this Court has said the settlement is what would make it an honest settlement when all the facts were known. All the facts were known. And the facts included, A, that there was pervasive contamination that had been covered up, and, B, that there was a conspiracy between DuPont's lawyers and DuPont's chemists to cover it up. Those are facts that would be very, very relevant. You're saying that the case becomes stronger because of the altitude documents, and therefore you can demand a higher settlement because the risk of losing is diminished. Absolutely. And that's what Kevin Malone said in his deposition. He's a lawyer. Let me ask you this. How do you prove the settlement value of these cases? Judge Reel held that your damaged evidence was speculative. How do you prove what these cases could have settled for? You prove it through expert testimony, and we had two experts, James Ventura and Andrew Burley. And I think there's an analysis in the Jiffy Foods case that we cited to the Court in our reply brief. These guys looked at what other similar cases settled for? Yes, they looked at that. How do you get that in under 408? Well, because under 408, you're not submitting the evidence directly. You're submitting it through an expert witness as a basis for his opinion. And what James Ventura did, when you read his opinion and Andrew Burley did, are two expert witnesses. These are lawyers. In the case of Mr. Ventura, he practiced for 35 years out there. Do you agree you couldn't have submitted it directly? I'm sorry? Do you agree that you couldn't have submitted what other cases settled for directly? No, I don't agree with that, because I think that the 408, the cases that cite 408 say you can't submit a settlement in your own case, but you can submit settlements in other cases if they are otherwise relevant. And here they are relevant to materiality. They are relevant to damage. If I slip and fall at a grocery store and they settle with me for $10,000, can somebody else, the next guy who slips and falls, offer evidence in that case that they settled with me for $10,000? If it's relevant to something other than just the value of your case or the liability in your case, the answer is yes, under 408. How about if it goes to the value of the case? Well, if it goes to the value of your case and it has another reason, for instance, it has a reason for unreasonable reliance or on materiality, it can still be admitted directly, but it can certainly be used by an expert. Did they object to any of your comparable settlements on 408 grounds? No, they did not. That may be the short answer. And I think they've waived that in any event. Part of the ‑‑ to switch topics, aside from the value of settlements in other cases and what happened in other cases, the question that DuPont raises here is what did Malone know at the time? The suggestion is that the documents were going to be produced. He knew they were coming out. He settled with that knowledge. He could have attended the deposition of the expert. How do you respond to that? Well, we responded in our brief in many ways. I think the simplest way to look at it is this way. All of that was before the Hawaii Supreme Court on the certified question. DuPont briefed those very points, and we pointed out and quoted from their brief when they briefed that to the Hawaii Supreme Court. And remember that the question of reasonable reliance here is a question of State law. And that's the reason Judge Ezra, who was the district court that was first in charge, sent it to the Hawaii Supreme Court. He said the question of reasonable reliance will be dispositive of the issue, so tell us what Hawaii law is on that. The Hawaii Supreme Court got the motion for summary judgment, the almost identical motion for summary judgment that Judge Reel ultimately ruled on. And they had all that in front of them. DuPont made these identical arguments to them. Well, you know, Malone knew it was coming. He should have waited, et cetera, et cetera. And the Hawaii Supreme Court said, you know, reasonable reliance is a question of fact almost all the time. And under these circumstances, we see no reason to depart from that, that we hold that reasonable reliance is a question of fact here and it should be submitted to the jury. It got back to Judge – before they made that determination, Judge Reel threw the case out on reasonable reliance, relying on Florida law. And then when this ruling came down from the Hawaii Supreme Court, we went back to them and said, look, the Hawaii Supreme Court said it goes to the jury. DuPont filed the same. He invited DuPont to refile their motion. They did. There was some new evidence that was submitted the second time around. The Lacey letter, for instance, Malone's testimony, for instance. And what they – what he ended up doing is ignoring the Hawaii Supreme Court. He says, I'm not – I'm a Federal judge. I don't have to pay attention to them, or words to that effect, completely violating Erie v. Tompkins and the United States Constitution. I mean, it was – it was mind-baffling to me. The whole notion was, let's let the Hawaii Supreme Court tell us whether reasonable reliance should go to the jury here. That happened. The Hawaii Supreme Court said it goes to the jury. And then what Judge Reel did afterwards is say, I don't care. You're still out on reasonable reliance. Let me turn to Judge Clifton's question, because I'm interested in that. Let me put it another way. If your clients had elected to rescind the settlement agreement and proceed to trial. Yes. Under what theory would you have gotten in to evidence that cover up? The same theory that happened in Kalamata. That's precisely what happened in Kalamata. Kalamata – the evidence was admitted in Kalamata. Yes, I know. Over strenuous objection under 404, as other bad acts. And it got into evidence. Our expert, Jody Johnson, was able to testify that the analytical chemistry testimony in the Bush Ranch 2 material was absolutely clear that they had found it extensively. In, I think, 71 out of 116 soil samples, they found SUs. And then put a man on the stand and said, in the Bush Ranch case, Albergo, who said they never found any. Refresh me. Yes. In the initial complaint that was at issue, it was settled, was there a claim for punitive damages? In Malone's initial complaint? Yes. Yes. I believe – I'm not clear that there was, but I know that when this evidence came out, and I know Judge Ibarra allowed the punitive damage issue to go to the jury. So whether it was in the complaint or not, initially in the Third Circuit complaints – and I'm frankly not clear right now where it was – but it would go to the jury anyway. Judge Ibarra let it go to the jury in Kalamata. Because – and again, we have to look at the other fraud that was going on here. Not just the Alta fraud. The Costa Rica fraud, where DuPont put Ventilate on plants in Costa Rica. The plants died. The scientist in charge told this man Vargas down there, who ran the test when he found  in discovery, in Kevin Malone's cases in Florida and in Hawaii, all prior field tests were requested, and DuPont just flat-lied about it. Didn't even admit that there was such a thing. And it wasn't until 1996, two years later, that it came out that all of this had happened. Vargas was deposed. All that came up before Judge Amy Donner down in Miami, and she defaulted DuPont for this – for the fraudulent way they conducted discovery in that case. Who was representing DuPont at that time? Was that Alston and Bird? Alston and Bird represented them in the Bush Ranch case. In the Friedman-Rodriguez cases, which is the Amy Donner case, I believe they were represented by Shook Hardy. And I think that's right. But it wasn't – and Alston and Bird may have had a tangential connection, but I think at that point they'd sort of moved them out of the way. I ask this to ask you as a sort of a gateway to get into the RICO claim. Yes. Judge Real ruled that these lawyers, the lab and DuPont, were not separate – were not sufficiently separate to be – to be an enterprise. Well, they – yeah. Not a separate enterprise. I think it's contrary to Supreme Court law. The Kuchner, I think, is the name of the case where they found that the fight promoter, King, that King could conspire with his own wholly owned company to form an enterprise. So when Judge Real says that DuPont can't conspire with all the lab's personnel and Alston and Bird lawyers to form an enterprise, it's directly contrary to Supreme Court law. That's our answer to that. And there are several other circuit – Second Circuit cases that deal with that same issue. So there is an enterprise. Do you want to save some time for rebuttal? Okay. Thank you, Your Honor. I'll save the rest of it. Good morning, and may it please the Court. My name is James Bogan. I represent DuPont in these consolidated appeals. And I'd like to start with the settlement that was orchestrated as between DuPont and Kevin Malone because it was unlike any other settlement in the underlying Ben Late cases. Malone represented 220 separate growers from Florida, Hawaii, Costa Rica, Panama, and Jamaica. He represented half of the entire Ben Late docket, if you will, half of all of the cases pending against DuPont across the country. He was an experienced trial attorney. He had lawyers on his litigation team that included one who owned a tree farm, had a degree in horticulture. Another lawyer had experience in analytical chemistry issues. And he invested $9 million, $9 million, in discovering and prosecuting these cases. DuPont paid $214 million to settle Malone's cases, half the Ben Late docket. And Malone, after the settlements, emphasized to his clients again and again how his settlement was different from any other, how he was the one who knew the facts, he knew the law, and was willing to make the investment and put in the time to do the cases right. Now, these clients, as was pointed out, they have affirmed the settlements of their underlying cases. They acknowledge that the product's claims are released, that they're dismissed with prejudice. And they're proceeding here under a very circumscribed settlement fraud theory. And that brings me to damages, which I believe is the most significant issue here, because it's dispositive of every single claim advanced by the plaintiffs in this case. And as was pointed out earlier by the panel, the legal measure of damages in a settlement fraud case is the difference between the actual settlement value and the probable amount of the settlement in the absence of fraud. And that measure of damages is reflected in a number of cases cited in Mazzurra 1. In the Slotkin case, the DeSabatino case, and the automobile underwriters versus rich case. And this was the damages theory that these plaintiffs originally pursued. As a matter of fact, in their final pretrial statement filed in this case, they advocated that measure of damages. They were going to prove what's the difference, what's the actual settlement value, and what would the settlement had been had there been no fraud. This theory changed, however, when we finally got the files of Kevin Malone, that they had fought and tried very hard against our seeing for years. They asserted privilege over Malone's files. And we finally obtained the production of those documents. And we found out that Malone had advised his clients that he settled the cases based on the assumption that he could win on liability. And that he got, in his particular opinion, full value in those settlements. That's just his opinion. He said it. They offered other opinions that the cases were worth more. He's never offered an opinion that the cases were worth more. Not him. They offered other people. They offered Ventura and Burley, who said the cases, contrary to what Malone says, were worth more than what Malone says. Well, that's interesting. I'd like to address that. Malone, throughout his entire deposition, Malone never gave a value. He never testified as to a value as to how much more he could have received. And then we have these experts. Well, it's probably not an accident. He's not eager to put a price tag on how he settled cheap against what he could have done if he'd played his cards differently. Well, that's a fair point. But these experts. I've never known an attorney to write his clients and say I didn't get full value for your case. Well. I should have gone elsewhere. Somebody else could have done a better job. Look very carefully at what these particular experts have done. First of all, starting with Malone's deposition testimony, when he testified at his deposition, he says you have to consider the individual circumstances of each plaintiff's claims. You have to see whether or not each one is a good witness. You have to evaluate whether they had problems on their farms like bacterial blight. You have to consider the issue of comparative negligence. I mean, that's Malone's testimony as to the factors that you have to look at and evaluate. Were all of his cases settled at the same time? They were all settled at the same time. Were they done on a farm-by-farm basis? They were. Malone's testimony is that while they were settled at the same time, the settlements were individually arrived at and individually approved by each particular client. That was his testimony in his deposition. But these particular. Let's return back to your central thesis, which is this is simply too speculative to know. How is that any different from the ordinary insurance bad faith case in which there's a settlement or a judgment and then there's discovery in the bad faith and the actions of the insurers put at issue and the question becomes what was the case really worth? Those cases go to juries all the time, and juries don't seem to have a problem with the somewhat inherently speculative nature of settlement value. Well, I think it's wrapped up in the measure of damages. I mean, if you look at the one case cited by the Ninth Circuit, automobile underwriters versus rich, it said what you have to do is you have to have a very clear evaluation of all of the facts and circumstances that apply to each of the individual claims. And then once you find out what the settlement value would have been, then you deduct the settlement amount. What's speculative here is that these experts absolutely did not do that. They did not talk to the individual plaintiffs. They did not talk to Malone. They didn't even review Malone's deposition testimony. They did no analysis of the specifics of these plaintiffs' cases. Why is that necessary if they're making a generic observation about the enhanced value based on one factor? Isn't that factor common to all the cases? The main problem with that is, and I invite the Court to look closely at these expert reports. I mean, you say that generic statement about what the cases are worth is, in using the words of the United States Supreme Court in Daubert, it's nothing more than ipsy-dixit. You know, all they do is they read a couple of sanctions orders, you know, the Bushranch sanctions order, the KT sanctions order, and then they come at the very end of the report, they say, I think they should have gotten three times as much as they got. And it's that process, that expert testimony, which on its face is just unduly speculative. It's not supported by any methodology. What would work? Huh? How else are you going to prove up a point like that? Well, the only way that I think you could do it, you would have to begin, I think, by having these attorney experts look closely at the specific strengths and weaknesses of these individual cases. Take the issue that this evidence speaks to isn't going to vary depending upon the particulars of somebody's individual farm. The issue has to do not with what happened on that particular farm, but on how the testing elsewhere suggested to DuPont that they should have known a long time before there was a problem with the product. Well, in this particular factual circumstance, Your Honor, you have Malone saying unequivocally he settled these cases based on the assumption he would win liability. So the fact that you could have additional liability evidence. They actually settled the cases based on the assumption they'd win liability and knew that DuPont was doing the same thing. I mean, you may have a great feeling that you've got a strong case, but if the other guy's got some whole cards that you think are troublesome, you wind up settling cheaper. Well, Malone never testified. I mean, he never backed off of that statement. He never said in his deposition that I discounted the value of these cases because I didn't think I had enough liability evidence at the time. He said precisely the opposite, and he never backed off of that. And I think it's because of that admission that the prospect of having additional liability evidence is just speculative. Well, much considered as damage enhancement evidence. In other words, unless he failed to consider that the evidence would enhance the damages, even assuming liability was reasonably clear. Well, this evidence absolutely would not enhance the damages. The evidence had nothing to do. I mean, you have an analytical test on another grower's farm. That might be helpful in making out a liability case. But when these growers have to prove damages, it has nothing to do with that evidence. They would have to prove lost profits. You know, plants dying. They're not selling as many plants. The damages proof is absolutely separate and apart, Your Honor, from the so-called liability evidence. There's no relationship. Go ahead. No, no. I was suggesting why do you have to look at farm by farm? Because this is entirely separate from damages evidence. Well, I'll give you a good example. Take the we have one plaintiff in here who grew anthuriums. And it's clear, it's undisputed that the anthurium growers had a significant problem with bacterial blight. I mean, their plants were ravaged by disease. Now, let's look at that individual circumstance. Why would additional liability evidence mean anything in that case? I mean, these experts certainly don't even begin to try to analyze that and understand. They discounted the claim because of the weakness of the liability. I'm sorry?  As liability, as the ability to prove the case goes up, so does the settlement value. Well, there's no evidence yet. Maybe not the absolute dollar value of the loss, but the ability to settle the case goes up as they have a stronger case for liability. The problem, Your Honor, on summary judgment is there was no testimony from Malone to that effect. As a matter of fact, Malone didn't even testify as to the individual. I mean, he did. That was Malone, I grant you. But what about these other guys who testified? Oh, Ventura? Yeah. They have no basis to say what happened at the settlement. I mean, while they can, you know, maybe there's a possibility that they can as experts. I mean, it sounds to me like you're arguing the weight of their testimony rather than its admissibility. No, they have no basis to say that liability was discounted under these particular circumstances when that is directly contradicted by Malone's testimony. I mean, Malone is the man through whom these plaintiffs were allegedly defrauded. And we have this deposition testimony and it's fixed. And the experts maybe could try to explain what Malone said in reaching an opinion, but I don't see that how they could come to factual conclusions that directly contradict what Malone said. I mean, these are facts. These are not aspects of an opinion. And I don't see any basis on an expert to opine on that. You know, again ---- Well, let's assume that the so-called cover-up evidence comes into trial. That certainly enhances the value of the case, don't you think? Well ---- If a jury believed. And theoretically, I know you probably dispute this, but theoretically, if cover-up evidence comes into a trial, if a judge allows it in under 404B or some other theory, generally speaking, that has a fairly significant effect on damages. Well, let's look what happened in the Kalamata-Tamono case. The cover-up evidence came in. And Judge Ibarra instructed the jury that they could consider DuPont's cover-up. The Hawaii Supreme Court reversed Judge Ibarra on precisely that point. The Hawaii Supreme Court said it was error for him to give that instruction, because, among other things, only a circuit court in the State of Hawaii has the power to sanction a party for discovering this conduct. It is absolutely outside of the province of the jury. Right. And so what happened in KT? I grant you the point on the jury instruction. But even if the evidence comes in, it does tend to have an effect on the jury whether or not a judge instructs on it or not. Well, again ---- Plain fact, it does. I mean, the only question here is, is there enough to believe that, with any rational basis, that there could be a damage award in excess of the settlement value that could be on this point, that that's reasonably ascertainable? Your Honor, the evidence here completely fails. I mean, it fails on two levels. On damage, in fact, because it's uncertain, given Malone's statement about what he was thinking at the time of settlement, that liability evidence would have made any difference. And they utterly failed to put on proof according to the legal measure of damages. I mean, we might be talking about a different case if they would follow the process that was laid out in, you know, automobile underwriters versus rich, where the ---- they look at the strengths and weaknesses of each case, and they look at the evidence, and then they come up a value of what the settlement would have been in the absence of fraud, and then deduct the actual settlement amount from that. But they utterly failed to do that. I mean, all of their experts' opinions are intertwined with the sanctions theory. The sanctions theory destroys the entire construct of the settlement fraud case, because if you discover the ---- if you discover or uncover the scheme, you discover the cover-up at the time of settlement, there's not going to be a settlement fraud. I mean, it's almost impossible. It just destroys the construct. And additionally, and I think this is very important, what they're trying to do here is to double-dip on punitive damages. They want a cover-up punitive element incorporated into their compensatory damages showing. Okay? And then they want, in this fraud case that we're dealing with here now, they want punitive damages on top of that for the same conduct, and then they want the compensatory award trebled under RICO. I mean, I think it's an entirely ---- there's no precedent for this type of approach. Well, let me take it another way. I mean, some people, and it didn't appear that the experts in this case did that, I grant you, but some people in evaluating settlement from a defense side or plaintiff's side would say, let's just do a probability analysis. What's our probability we're going to win liability? What's our probability we're going to prove damages? What's the damages range? And so forth. And if you do a probability analysis of this case, it seems to me that there is an argument that the probability of a higher value can be reasonably ascertained. You can say the probability with a stronger liability case enhanced each case X percent. I mean, you have to conceive the theory. I know you say these experts don't say that, but it seems your argument centrally is it can never be known, and it just seems to me that's contrary to our experience in analogous cases. Your Honor, if you're going to do that probability analysis, you know what you would do. You would examine the liability evidence and you would discuss the liability evidence and the strengths and weaknesses of the case. You would do that, which these experts didn't do, and then you would look at your damages proof. True. And they didn't do that. There's no proof of what their underlying damages were. There's no evidence in this record. Let's put it another way. Let's say, I mean, you did get a defense verdict in one of these cases, right? We have gotten defense verdicts in these cases. So, I mean, I realize what Malone says, but normally it's very, unless it's an admitted liability case, in doing a probability analysis on liability, you don't put peg liability at 100 percent. I know he seemed to, but it would be rare for people to do that. So let's say you peg it at 80 percent, 75 percent. Even if the liability analysis is strengthened 5 percent, that comes out with some number, right? Right. So if there is expert testimony to that effect, certainly that is reasonably ascertainable as a matter of proof that's at least sufficient to go to a jury. Well, I, you know, Your Honor, I would have to agree with that, but you're making a lot, there's then a methodology in that expert report that passes. Hypothetical. Right. I mean, you have to have a methodology that's recognized under Daubert that you have, you know, it's a proper subject of expert testimony. And you have to have that evidentiary foundation. Right. But it doesn't, you know, these kinds of, returning to my analogy to bad faith cases, this is not unusual for juries to hear testimony about case value. And some people do it more methodically, as I've described, than others. But some people come in with evidence, just as we have in this case, to say, look, this was worth a lot more than they got at this, absent the fraud. And those cases go to the jury. Juries decide those cases, and they go forward. What's different about this? Well, because here we're dealing with a very specific measure of damages. What would the settlement have been had there been no fraud? And in a bad faith case, I don't know what the measure of damages is just off the top of my head. But here you, there's a specific direction on how to do it. And I really don't think that this measure of damages necessarily applies in a bad faith case. But here you have to prove independently what is the value of the settlement had there been no fraud. I mean, I think that the trial judge would have even been, in handling a settlement fraud case, would even be permitted to not let the jury hear any evidence of what the original settlement was, that the, according to the automobile underwriters v. Rich case, the plaintiff could go on and put on, reconstruct the settlement. This is how the settlement would have happened had we had all of the evidence. And then the jury could come up with a number. And then the judge can then take the settlement amount, which is undisputed, and just subtract it. There's no need for the jury really to even hear that evidence. And so the question is, it focuses back on what is the value at that day in April of 1994? Just give them the evidence, but you're locked in that period of time. How do you prove that up? And all of the other evidence is irrelevant. The Bush Ranch sanctions order didn't come out to 1995, irrelevant. The KT sanctions order, irrelevant, because those orders did not exist on the day of the settlement. It would have been completely irrelevant to that showing. And all of these experts, and even Malone, testified about the value of this evidence through the prism of those sanctions rulings. Malone said, well, it looks like that evidence was important because Judge Elliott said it was important. Or it looked like this other evidence was important because Judge Donner said it was important. That evidence is absolutely and completely inadmissible on the legal measure of damages in a settlement fraud case. And there is just no evidence here that the experts even approached it the right way, the legal way. They didn't even approach it the way Kevin Malone approached it. Because, again, as Malone said, it's undisputed. You have to consider individualized circumstances. Could you tell me why DuPont and Alston Bird and Alta Labs aren't sufficiently distinct entities for RICO purposes? Well, first of all, we've had the same issue examined by a couple of courts. Judge Gold evaluated this distinctiveness issue in the latest Florida Evergreen case. With respect to the same allegations against DuPont. That's the answer. It seems to me these are separate entities. Alston and Bird is a law firm someplace. DuPont is a Fortune 500 company. Alta Labs is a laboratory. Why aren't these distinctive? They're not separate because when you're dealing with a liable corporate person, in this case DuPont, which only can act through its employees and its agents, you do not have a sufficiently distinct enterprise from the person. Suppose DuPont hired Tony Soprano to break into the office of the plaintiffs and burn their files. Would they be sufficiently distinctive? Under those circumstances where you're hiring a mob person, I mean. Okay, so I don't understand. If they hire, you fill in the blank. They hire a law firm. They hire a laboratory. They hire a thug. I mean, whoever it is. They hire some independent entity to go do something, do some dirty deed. I don't understand why they're not sufficiently distinctive. Well, RICO, enterprises do not cover simple conspiracies. Enterprises do not cover the simple commission of the predicate acts. The RICO statute is not an uber conspiracy statute that is designed to pull in all simple conspiracies. I mean, all I can say is that when a corporation like DuPont hires an outside law firm to defend itself in products liability litigation, I don't see how you can get a distinct RICO enterprise out of that. I mean, the allegations that they have in this case is that DuPont in-house attorneys were participating in a fraud, that DuPont in-house scientific experts were giving false testimony. And the allegations that they make relative to the outside lawyers and the outside experts are not different in any way. They were doing, the outside lawyers and the outside experts were doing precisely the same thing that the in-house attorneys were doing and the in-house scientists were doing. There's just no, they're all defending DuPont's interest. The purpose of this enterprise was to diminish DuPont's liability for Benley claims. It's only DuPont that faces liability for Benley claims. In the Tony Soprano example, he's got a very different separate interest in that pure organized crime paradigm. My turn. Any further questions from the panel? Thank you. Thank you very much for your time. Thank you. Your Honor, just briefly on the question of what the law is with respect to, here in the Ninth Circuit has been articulated as it relates to the speculative nature of damages in a case of this type. In the first Matsuura decision, and I have it here in front of me, and I'm quoting, they remember that these releases were all governed by Delaware law, and so at this point when Matsuura 1 came here, the Delaware Supreme Court had not yet ruled on what remedy was available. However, there was a federal district court there that had ruled on this exact question called, and the case is called Di Sabatino. The Ninth Circuit said that Di Sabatino correctly foreshadows what Delaware law will be, and in footnote 4 of the Di Sabatino decision, this court, not this panel, but this court stated, we agree with Di Sabatino that these arguments are unpersuasive, and the arguments about why you have to follow rescission rather than bring an independent action. And the second point was, damages for fraud are conceptually different from damages for the underlying tort claims and are not too speculative to calculate. So that's the holding of this court as it relates to this case or these cases foreshadowing what the Delaware Supreme Court would do. It doesn't speak to the evidence that you've actually submitted. I mean, you're the plaintiff. To survive summary judgment, you have to offer up sufficient evidence to sustain a verdict. Yes. And so none of this evidence, the question of whether what Mr. Malone said or Mr. Ventura said or the other experts said, that wasn't being examined by our predecessor panel. That's correct. It was a motion under 12C, whether the ---- Well, the question I want to pose to you now is, what evidence is there sufficient to sustain a verdict of damages taking, assume for the moment, except my proposition that I don't think you get the cover-up claim as part of your case. Do you have evidence sufficient to prove up what the settlement value absent fraud of these cases were? Well, yes. I mean ---- Where is that evidence? The opinions of James Ventura and Andy Burley. The testimony of Pat Lee, DuPont's lawyer that settled the Davis Tree Farm cases in Florida, who said that they paid the Davis Tree Farm plaintiffs two to three times on average what they paid Malone, and Malone was the highest that had been paid previously. And the reason for that was because in the Davis Tree Farm case, all of this evidence was known to the plaintiffs' lawyers. And that tells you what it means to have this evidence. To say that it's not relevant to the damage equation when you're talking about the settlement just misses the point. Because obviously a plaintiff's lawyer, if he's got evidence, not only that the defendant found contamination but then lied about it and covered it up, of course it's going to affect the value of the settlement. And that's what ---- But if you have to submit that cover-up element as part of a settlement fraud case, the point of it is supposed to be what's the value absent the fraud. I mean, the fraud was the cover-up. So if you take out the fraud, what's the cover-up value? Honestly, you keep saying that, but that is not the measure. Look at the De Sabatino language. Okay. The plaintiff may keep what he received and file suit against ones committing the alleged fraud and recover, quote, such an amount as will make the settlement an honest one. It doesn't say without the fraud. It says if you get all the evidence that you have on the day of the settlement that makes it an honest settlement, that's what you get. That's what happened in Davis Street Farm. It goes on to say the true measure of damages is the difference in settlement value before and after discovery of the fraud. The fraud is absolutely part of the settlement calculation. And anybody who has handled any case like this where you get this kind of evidence to say that you've got fraud evidence and that doesn't impact the settlement value? Oh, sure it does. Of course it does. But are you in a fraud case, is there authority to say you can get damages, you can get punitive damages, cover-up damages for the fraud if discovered at the moment before we go to trial so we can prove up the fraud? Or do you say absent fraud? No. You say what is the – what will make this settlement honest? What makes it honest is for the plaintiffs to know everything that DuPont knew. That's what makes it honest, that DuPont was obligated to know. So they know it until the moment before trial so that they can prosecute based on a cover-up. At the time they make the settlement decision. This is a fraudulent inducement into a settlement agreement. The question is what would they have done in that settlement agreement had they known all the relevant facts? And that includes the fraud. You can't – the fraud is embedded in the evidence that was concealed. I'm not clear. Does punitive damages figure into this? Can – does that figure into the settlement value of the case? I think the threat of punitive damages does figure into it. The threat of having a default judgment rendered against DuPont because of their fraudulent conduct enters into it. Of course, if I'm going to go to DuPont's lawyers and I say, hey, fellas, we're going to get you defaulted here. That's going to cost money. If you want to settle this case, you've got to pay more money. Because if I default you, then my, you know, Katie barred the door on the verdict and I'll have punitive damages in there because you committed fraud. Of course that affects the settlement value. Now, the question that I have thought about that I think maybe speaks to what you're talking about is then what happens in the instructions in the settlement fraud case about whether you get punitive damages on top of the threat of punitive damages? And that's a question that hasn't been answered by any trial court and that's something that the trial court will have to grapple with. But it's not even before us right now. It's not before you right now. What's before you right now is whether there was adequate evidence. And you look at Pat Lee's testimony. He settled this Davis Street Farm case with all this evidence. And he said we had to pay two to three times as much as Malone got paid. It turns out, interestingly, that deposition testimony wasn't taken, I think, until after James Ventura rendered his expert report. And guess what he said. Malone got 25 cents on the dollar. He should have got 65 to 75 cents on the dollar, two to three times. It's interesting what happens when people who are experienced look at this evidence and say, you know, this would have enhanced the value of these cases. And there's just absolutely no question that it would have. So thank you, Your Honor. Thank you. The case, it's heard, will be submitted. We'll take a 20-minute recess and then meet with Butterfield and her group. All rise. This court stands recess is 20 minutes.
judges: Thomas, Silverman, Clifton